J-S18026-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: ADOPTION OF: R.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 263 MDA 2022 |

Appeal from the Decree Entered January 18, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 075 Adopt 2021,
076 Adopt 2021, 077 Adopt 2021,
078 Adopt 2021, 079 Adopt 2021,
CP-21-DP-0000112-2020, CP-21-DP-0000231-2018,
CP-21-DP-0000232-2018, CP-21-DP-0000233-2018,
CP-21-DP-0000234-2018

| IN RE: ADOPTION OF: R.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 264 MDA 2022 |

Appeal from the Decree Entered January 18, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 076 ADOPT 2021

| IN RE: ADOPTION OF: R.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 265 MDA 2022 |

Appeal from the Decree Entered January 18, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 077-ADOPT-2021

| | | |
|---|---|---|
| IN RE: ADOPTION OF: R.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 266 MDA 2022 |

Appeal from the Decree Entered January 18, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 078 ADOPT 2021

| | | |
|---|---|---|
| IN RE: ADOPTION OF: R.Y., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.K. M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 267 MDA 2022 |

Appeal from the Decree Entered January 18, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 079-ADOPT-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: R.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 273 MDA 2022 |

Appeal from the Order Entered February 11, 2022

In the Court of Common Pleas of Cumberland County Juvenile Division at No(s): CP-21-DP-0000231-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: R.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 274 MDA 2022 |

Appeal from the Order Entered February 11, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at No(s): CP-21-DP-0000232-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: R.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 275 MDA 2022 |

Appeal from the Order Entered February 11, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at No(s): CP-21-DP-0000233-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: R.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.K.-L.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 276 MDA 2022 |

Appeal from the Order Entered February 11, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at No(s): CP-21-DP-0000234-2018

J-S18026-22

IN THE INTEREST OF: R.Y., A MINOR     :     IN THE SUPERIOR COURT OF
                                      :            PENNSYLVANIA
                                      :
APPEAL OF: A.K.M., MOTHER             :
                                      :
                                      :
                                      :
                                      :
                                      :
                                      :     No. 277 MDA 2022

Appeal from the Order Entered February 11, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s):  CP-21-DP-0000112-2020

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.:              **FILED: AUGUST 12, 2022**

A.K.M. ("Mother") appeals from the decrees terminating her parental rights as to her minor children, as well as from the orders changing the goal to adoption.[1] Mother's counsel has filed an **Anders**[2] brief and a petition to withdraw as counsel. We grant counsel's petition to withdraw, affirm the termination decrees, and dismiss the appeals from the goal-change orders as moot.

Mother is the biological mother of five children (collectively "Children"): R.W., born in 2013 ("R.W.2013"), R.W., born in 2014 ("R.W.2014"), R.M.,

_____

[1] Mother filed separate notices of appeal from each order and we consolidated the appeals *sua sponte*. **See** Pa.R.A.P. 513. The trial court also terminated the parental rights of D.W. ("Father") as to his two biological children and his appeals are pending separately at Nos. 176 and 177 MDA 2022.

[2] **Anders v. California**, 386 U.S. 738 (1967); **see also In re V.E.**, 611 A.2d 1267, 1275 (Pa.Super. 1992) (holding **Anders** protections apply to appeals of involuntary termination of parental rights).

- 4 -

born in 2017 ("R.M.2017"), R.M., born in 2018 ("R.M.2018), and R.Y., born in 2020. Father is the biological father of the two oldest children, R.W.2013 and R.W.2014. The father of the other three children is deceased.

All Children, except for R.M.2018, have significant special needs, which require additional and specialized care. N.T., 12/3/21 A.M., at 52; N.T., 12/3/21 P.M., at 36. Specifically, R.W.2013, R.W.2014, and R.M.2017 have autism. N.T., 12/3/21 A.M., at 52. Several of the Children are either non-verbal or limited with talking and are not toilet trained. *Id.* at 54; N.T., 12/3/21 P.M., at 33. R.Y. was born with Wolff-Parkinson-White syndrome, which is a heart condition that requires him to take daily medication. N.T., 12/3/21 A.M., at 52-53.

In July 2018, the Cumberland County Children and Youth Services ("CYS") received a General Protective Services referral alleging that there were parenting issues, mental health concerns, lack of medical care for Children, inadequate food, and domestic violence in the home between Mother and Father. *Id.* at 50-51, 55. Mother was also unable to cope and overwhelmed with Children. *Id.* at 55. Mother and Father were living at the home with all five Children at that time. Upon this referral, CYS learned that there was lead in the home and that R.W.2013 had been found to have very high levels of lead in him. *Id.* at 51. R.W.2014 and R.M.2017 also had levels of lead in them but not as high as R.W.2013. *Id.* CYS advised Mother and Father to vacate the home. *Id.* The Department of Health found lead in the home after conducting an environmental test and directed Mother and Father

to have Children re-tested. *Id.* However, no appointments were made to have Children re-tested except for one child. *Id.*

When CYS learned that only one child had been re-tested for lead, it removed Children from Mother and Father's care by emergency order in December 2018. *Id.* at 51-52. R.W.2014, R.M.2017, and R.M.2018 were placed in foster care, while R.W.2013 was hospitalized for lead treatment. *Id.* at 52. Mother moved out of the home that contained the lead in December 2018. *Id.* at 56. Father continues to reside in that home. N.T., 12/3/21 P.M., at 21-22; N.T., 1/14/22, at 25.

Children were adjudicated dependent on January 10, 2019, and R.W.2013 was placed in a different foster home from his siblings after his hospitalization due to his special needs. N.T., 12/3/21 A.M., at 52. R.W.2013 was eventually placed in his maternal grandmother's house in March 2021. *Id.* at 54. R.Y. was born in 2020 and was placed in the same foster home as his three siblings when he was seven months old. N.T., 12/3/21 P.M., at 30. The four youngest siblings, R.W.2014, R.M.2017, R.M.2018, and R.Y., currently reside in the same foster home, which is a pre-adoptive home. *Id.* at 28, 67. R.W.2013 continues to reside with his maternal grandmother, who is also a pre-adoptive resource. *Id.* at 28, 89. Children have sibling visits with each other. *Id.* at 31.

CYS ultimately filed petitions for involuntary termination of Mother and Father's parental rights in November 2021. Hearings on the petitions were held on December 3, 2021 and January 14, 2022. The court heard testimony

from the CYS caseworkers, foster mother, maternal grandmother, maternal grandmother's roommate, Father's probation officer, the Court Approved Special Advocate ("CASA"), Mother, and Father.

As part of the reunification plan, Mother's goals were to maintain appropriate housing, visitation with Children, improve parenting skills, and mental health treatment. N.T., 12/3/21 P.M., at 8-9. Father's goals were to obtain housing, improve parenting skills, mental health treatment, drug and alcohol treatment, and visitation with R.W.2013 and R.W.2014. *Id.* at 16-23.

Mother made progress on her goals and by October 2019, R.M.2017 and R.M.2018 were returned to her care. *Id.* at 49. In December 2019, R.W.2013 was returned to Mother's care. *Id.* After Mother gave birth to R.Y. in March 2020, he was also placed in Mother's care. *Id.* at 49-50. At that time, Mother had four of the Children in her care and had overnight visits with R.W.2014. *Id.* at 51. R.W.2014 remained in foster care at the foster home.

In May 2020, Mother moved into a shelter with four of the Children along with her paramour, the now-deceased father of the three youngest children. N.T., 12/3/21 A.M., at 57. In August 2020, they were asked to leave the shelter due to constant reports of the police having to come to the shelter for domestic arguments between Mother and the now-deceased father. *Id.* At that time, R.W.2013's behaviors became overwhelming for Mother so she arranged for him to temporarily live with Father's cousin. *Id.* at 57-58. Mother's mental health began to decline, and she reported that she "was not a good mother" and that "things were closing in on her." *Id.* at 60; N.T.,

12/3/21 P.M., at 52. Mother went to a crisis center and was recommended for an inpatient partial program, but she declined. N.T., 12/3/21 A.M., at 60-61; N.T., 12/3/21 P.M., at 54.

The family then moved into motels until September 2020, when Mother was able to obtain an apartment. N.T., 12/3/21 A.M., at 58. R.W.2013 returned to Mother's care and four of the Children, along with the now-deceased father, lived at the apartment. *Id.*

On October 26, 2020, Mother was arrested for allegedly stabbing the biological father of the three youngest children, which resulted in his death. *Id.* at 65. R.M.2017, R.M.2018, and R.Y. were then immediately placed into the foster home where their sister, R.W.2014, was living. *Id.* at 49. R.W.2013 was eventually placed with his maternal grandmother. *Id.* at 54. R.W.2013, R.M.2017, R.M.2018, and R.Y. were behind on their medical appointments and immunizations when they came into placement at that time. N.T., 12/3/21 P.M., at 14.

Since her arrest, Mother has been incarcerated awaiting trial. N.T., 12/3/21 A.M., at 65-66. She has not had any visits with Children since her incarceration because she did not want Children to see her behind the prison glass. However, Mother has had phone calls with Children and has sent them cards and letters. N.T., 12/3/21 P.M., at 15, 86. Mother testified that she would like all five children to be placed with her mother while she is incarcerated. N.T., 1/14/22, at 14-16.

Father struggled to meet his goals throughout the case. Although he completed a parenting assessment in November 2018, he declined to participate in the recommended parenting education services. N.T., 12/3/21 A.M., at 27. From the beginning of the case until January 2021, Father had no contact with CYS and made no progress on any of his goals and only occasionally visited his two biological children, R.W.2013 and R.W.2014, with Mother always present. N.T., 12/3/21 P.M., at 23-26. In January 2021, he reached out to CYS to schedule visits with R.W.2013 and R.W.2014. *Id.* at 26. CYS made a referral for guided visits but Father never followed up with the scheduled intake appointment. *Id.* at 26-27. Father was then incarcerated from February 2021 to August 2021. Father declined visits with R.W.2013 and R.W.2014 while incarcerated. *Id.* at 27.

In October 2021, Father began working on his reunification goals. He began having weekly guided visits with R.W.2013 and R.W.2014 at Alternative Behavior Consultants ("ABC"). N.T., 12/3/21 A.M., at 41-42. However, R.W.2014's foster mother reported that R.W.2014 becomes defiant and rolls on the floor following visits with Father. N.T., 12/3/21 P.M., at 36-37. In October 2021, Father began intensive outpatient therapy to address his mental health and drug and alcohol treatment and was reported to be doing well in therapy. *Id.* at 20. Father has also consistently had negative drug screens since October 2021. *Id.* at 20, 43-44. However, Father's housing has not changed and he still resides in the home with high levels of lead. *Id.* at 21.

Father testified that he has been sober for 11 months and he attends drug and alcohol classes three days a week. N.T., 1/14/22, at 19. He admitted that when Mother was making progress on her goals, he "backed off" on his reunification goals. *Id.* at 23. He stated that he has been more engaged since his release from prison. *Id.* Father admitted that he still resides in the same home with the lead but stated that he is on waiting lists for other apartments. *Id*. at 25. Father testified that he is bonded to his children. *Id.* at 21.

Sandra Gibson, the CYS caseworker, testified that R.W.2014, R.M.2017, R.M.2018, and R.Y. are doing very well in the foster home. N.T., 12/3/21 P.M., at 28. Gibson stated that the foster parents are very good at meeting the children's specialized needs, responding to their behaviors, and showing them love and affection. *Id.* at 31. She indicated that the children feel safe and secure in the home. *Id.* at 29. Gibson noted that R.W.2014 has been with the foster parents for close to three years and R.Y. has been there for over half of his life. *Id.* at 28, 30. She testified that all four children are very bonded to the foster parents and call the foster mother "mama." *Id.* at 28-29, 30-31.

Foster mother testified that R.W.2014, R.M.2017, R.M.2018, and R.Y. are thriving in her care because it is a structured environment. *Id.* at 66, 71. She stated that she and her husband love the children and would like to adopt them. *Id.* at 67.

Maternal grandmother testified that she is bonded with R.W.2014 and is willing to adopt him. *Id.* at 89, 90.

Father's visitation supervisor at ABC, Kevin Beam, testified that guided visits between Father and R.W.2013 and R.W.2014 began in October 2021. N.T., 12/3/21 A.M., at 41. Beam stated that visits were chaotic in the beginning but are "getting progressively better." *Id.* at 43. He observed a bond between Father and R.W.2013 and R.W.2014. *Id.* at 45.

The CASA worker, identified in the transcript only as Mr. Howell, agreed with Gibson that the foster parents love R.W.2014, R.M.2017, R.M.2018, and R.Y. and have provided them with the most stability they have ever experienced in their short lives. N.T., 1/14/22, at 39. Mr. Howell stated the children have "flourished academically, socially, emotionally, and physically while in the care of" the foster parents. *Id.* He further stated that maternal grandmother loves R.W.2013 and she has provided him with stability and support while he has been in her care. *Id.* at 39-40.

Children's Guardian *ad litem* ("GAL") stated Children are very loved and stable in their respective pre-adoptive homes and recommended that it was in Children's best interests for Mother and Father's parental rights to be terminated. *Id.* at 44.

The court attempted to speak with two of the children but determined that they were not competent to testify. *Id.* at 43. Children's legal counsel concurred that Children did not understand the nature of the proceedings and therefore, deferred to the recommendations of the GAL and CASA. *Id.* at 44-45.

Following the termination hearing, the court changed the permanency goal to adoption for Children. The court also involuntarily terminated Mother's parental rights as to all five Children and involuntarily terminated Father's parental rights as to his two biological children, R.W.2013 and R.W.2014. This appeal followed.

Mother's counsel's **Anders** brief identifies two issues:

1. Did the trial court abuse its discretion or commit an error of law when it found, despite a lack of clear and convincing evidence, that [Children's] permanent placement goal of reunification was neither appropriate, nor feasible and ordered a goal change to adoption, thus contravening section 6351(f) of the Juvenile Act, 42 Pa. C.S.[A.] § 6351(f)?

2. Did the trial court abuse its discretion or commit an error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of [Mother's] parental rights in her [Children], and when it failed to primarily consider [Children's] developmental, physical and emotional needs and welfare, thus contravening sections 2511(a) and 2511(b) of the Adoption Act, 23 Pa.C.S.[A.] §§ 2511(a) & 2511(b)?

**Anders** Br. at 4.

Before reviewing the merits of this appeal, we must first determine whether counsel has satisfied the necessary requirements for withdrawing as counsel. **See Commonwealth v. Goodwin**, 928 A.2d 287, 290 (Pa.Super. 2007) (*en banc*) ("When faced with a purported **Anders** brief, this Court may not review the merits of any possible underlying issues without first examining counsel's request to withdraw"). To withdraw pursuant to **Anders**, counsel

must: 1) "petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous;" 2) furnish a copy of the brief to the client; and 3) advise the client that he or she has the right to retain other counsel or proceed *pro se*. **Commonwealth v. Cartrette**, 83 A.3d 1030, 1032 (Pa.Super. 2013) (*en banc*).

> Additionally, in the **Anders** brief, counsel seeking to withdraw must:
>
> > (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Commonwealth v. Santiago**, 978 A.2d 349, 361 (Pa. 2009). If counsel meets all of the above obligations, "it then becomes the responsibility of the reviewing court to make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous." **Id.** at 355 n.5 (quoting **Commonwealth v. McClendon**, 434 A.2d 1185, 1187 (Pa. 1981)).

We find that counsel has complied with all of the above technical requirements. In his **Anders** brief, counsel has provided a summary of the factual history of the case with citations to the record. Further, counsel's brief identifies two issues that could arguably support the appeal, as well as

counsel's assessment of why the appeal is frivolous, with citations to the record. Additionally, counsel served Mother with a copy of the **Anders** brief and advised her of her right to proceed *pro se* or to retain a private attorney to raise any additional points she deemed worthy of this Court's review. **See** Application for Leave to Withdraw, 4/13/22, at ¶ 30; **Anders** Br., Appendix D. Mother has not responded to counsel's petition to withdraw. As counsel has met the technical requirements of **Anders** and **Santiago**, we will proceed to the issues counsel has identified.

We address Mother's two issues in reverse order. In her second issue, Mother argues that the court abused its discretion in terminating her parental rights pursuant Sections 2511(a) and 2511(b) of the Adoption Act.

We review an order involuntarily terminating parental rights for an abuse of discretion. **In re G.M.S.**, 193 A.3d 395, 399 (Pa.Super. 2018) (citation omitted). In termination cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (quoting **In re Adoption of S.P.**, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." **In re Adoption of K.C.**, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **In re Adoption of S.P.**, 47 A.3d at 826.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *In re Adoption of K.C.*, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (quoting *In re Z.S.W.*, 946 A.2d 726, 728-29 (Pa.Super. 2008)).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Instantly, the court terminated Mother's parental rights pursuant to Section 2511(a)(8). **See** Trial Court Opinion, filed 3/10/22, at 13. That section states:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Section 2511(a)(8) "sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." **In re A.R.**, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been proven, the court "must next determine whether the conditions that led to the children's removal continue to exist." **Id.** "As a result, the relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." **In re I.J.**, 972 A.2d 5, 11 (Pa.Super. 2009). "Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement

- 16 -

or the availability or efficacy of Agency services." ***In re Z.P.***, 994 A.2d 1108, 1118 (Pa.Super. 2010).

Here, Children were removed from Mother's care following her incarceration on October 26, 2020. Therefore, Children had been removed from her care in excess of 12 months. We next focus our inquiry on whether the conditions which led to Children's removal from Mother's care continued to exist at the time the court terminated Mother's parental rights.

The court found that the conditions that existed at the time of Children's placement continued to exist at the time of the termination hearing. Trial Ct. Op. at 14. The court recognized that Mother was making significant progress in 2020, particularly by obtaining housing, completing her parenting programs, and having four of the children back in her care. ***Id.*** at 13. However, the court found that Mother's mental health had declined and she had difficulty in keeping up with the children, who required substantial care and supervision. ***Id.*** at 14. The court opined that Mother's declining mental health contributed to her arrest in October 2020. The court explained:

> We are sympathetic to Appellant-Mother's prior difficulties in achieving housing stability and her consistent struggle with mental health over the life of this case which reached tragic lows, but we find that the conditions which led to the [C]hildren's removal have not been remedied and, indeed, the latest evidence we have of [Mother's] ability to cope with supervising four of five of the [C]hildren included [Mother] going to Crisis, declining recommended inpatient mental health treatment, and ominous statements to the case worker about the downturn of her mental health.

***Id.***

The record supports the court's finding that the conditions which led to Children's removal continue to exist. Mother has not effectively parented Children since her incarceration. Although she has had phone calls with Children while incarcerated, she has declined visitation with Children. When Children were placed following her arrest, they were behind on their medical appointments and immunizations. Moreover, prior to her incarceration, Mother's mental health had significantly declined and she refused the recommended inpatient treatment. At that time, Mother reported that she was overwhelmed with caring for Children. Because Mother failed to remedy the situation that led to Children's removal from her care, and, as discussed below, termination of parental rights would best serve the needs and welfare of Children, we find no reasonable basis on which to argue that the requirements of Section 2511(a)(8) were not satisfied.

Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. *See* 23 Pa.C.S.A. § 2511(b). This inquiry involves assessment of "[i]ntangibles such as love, comfort, security, and stability[.]" *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." *Id.* However, the "mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). Rather, the trial court must consider whether severing the

bond "would destroy an existing, necessary and beneficial relationship." *Id.* (citation and internal quotation marks omitted). The court must also examine any pre-adoptive home and any bond between the child and the foster parents. *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013).

Instantly, the court found that termination of Mother's parental rights was in the best interests Children. Trial Ct. Op. at 17-18. The record supports the court's finding. There was ample evidence that Children are very bonded with their foster caregivers and Children feel loved and secure in their respective foster homes. While Children have bonds with Mother, the court recognized that Children deserve permanency and stability, especially after numerous placements. We perceive no reasonable basis on which to challenge the conclusion that termination of Mother's parental rights would be in Children's best interests.

In Mother's remaining issue, she argues that the court erred in changing Children's permanency goal to adoption. Mother asserts that the court failed to consider evidence of maternal grandmother's ability and desire to care for all five children during Mother's incarceration. Mother's Br. at 14. As a result, Mother argues that the court disregarded a primary purpose of the Juvenile Act, which is to preserve the unity of the family. *Id.*

This issue is moot given our affirmance of the involuntarily termination of Mother's parental rights, based on our finding of frivolousness. *See Int. of A.M.*, 256 A.3d 1263, 1272-73 (Pa.Super. 2021) (finding issues regarding goal change moot in light of termination of parental rights); *In re Adoption*

*of A.H.*, 247 A.3d 439, 446 (Pa.Super. 2021) (same), *appeal denied*, 258 A.3d 1144 (Pa. 2021); *Int. of D.R.-W.*, 227 A.3d 905, 917 (Pa.Super. 2020) (same). We therefore dismiss the appeals of the orders granting the petition for goal change.[3]

To summarize, we find that the issues raised in counsel's *Anders* brief are wholly frivolous. Further, after an independent review of the record, we conclude that no other, non-frivolous issue exists. Therefore, we grant counsel's petition to withdraw. Having determined that the appeals are wholly frivolous, we affirm the decrees terminating Mother's parental rights. Because we affirm the termination decrees, the appeals from the goal-change orders are moot. We therefore dismiss those appeals.

Petition to withdraw as counsel granted. Decrees involuntarily terminating Mother's parental rights affirmed. Appeals from orders changing Children's permanency goal dismissed.

---

[3] We note that the trial court took evidence on Mother's Motion to Modify Child Placement, which requested that all five children be placed at maternal grandmother's home. The court denied that motion before entering orders terminating Mother's parental rights. Mother has not appealed the denial of that motion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/12/2022